## AFFIDAVIT OF TASK FORCE OFFICER KYLE PHELAN

I, Kyle S. Phelan, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Since 2022, I have been a Task Force Officer with the Drug Enforcement Administration ("DEA").  In addition, I am a Police Officer employed by the Barnstable Police Department currently assigned to the Detective Division.  I have been a Police Officer since 2015.  I received a Bachelor of Science degree in Criminal Justice from Salem State University in 2014.  I have testified in Barnstable District Court, Falmouth District Court, and Barnstable Superior Court.  As a Police Officer, I have been involved in numerous narcotics investigations resulting in convictions for drug offenses, as well as seizures of drugs, firearms and drug proceeds.

2.      I have completed an eight-day instructional class in "Street Level Narcotics Investigations" as well as another two-day course on the "Investigation of Narcotics for Patrol Officers" hosted by the Municipal Police Institute (MPI).  The instruction emphasized violations pertaining to Massachusetts General Law Chapter 94C, search warrant requirements, informant management, surveillance techniques, drug identification, and proper search warrant execution techniques.  I have also received additional training in a two-day class focused on the preparation of Search Warrants hosted by MPI.  I have also completed a 1-day course on "Cell Phone Mapping" hosted by Commonwealth Police Legacy and a 1-day course on "Social Media & Cell Phones Investigations" hosted by MPI.

1

3.       As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in narcotics trafficking.  I am also familiar with various items used to package, process, deliver, and serve as containers for cocaine, heroin, fentanyl, crystal methamphetamine, MDMA and commonly abused medications, as well as other controlled substances.

4.       I am currently investigating Ryan BANTON a/k/a Jamaica (born 1996) for possession with intent to distribute and distribution of controlled substances, and conspiracy to commit the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (the "Target Offenses").

## PURPOSE OF THE AFFIDAVIT

5.       I submit this affidavit in support of applications for search warrants for the following target locations, which are described in greater detail below and in the attachments to the relevant warrant applications:

    a.       133 Azalea Drive, Harwich, Massachusetts (the "Target Location 1"), as described in Attachment A-1; and

    b.       18 Autumn Drive, Yarmouth, Massachusetts (the "Target Location 2") as described in Attachment A-2; and

    c.       the person of Ryan BANTON, a/k/a Jamaica, (born 1996), as described in Attachment A-3.

6.       I submit this affidavit in furtherance of an ongoing criminal investigation into BANTON, Robert REID (born 1986), an as of yet identified individual nicknamed "BLADE," and others known and unknown (hereinafter, the "Target Subjects") concerning violations of federal law including 21 U.S.C. §§841(a)(1) (distribution and possession with intent to distribute

2

controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute

controlled substances) (hereinafter, the "Target Offenses").

7.      The facts in this affidavit come from my personal observations and information

obtained from other agents, investigators, and witnesses. My interpretations of conversations,

conduct, and events detailed herein are based on my training and experience and knowledge of

the investigation. This affidavit is intended to show that there is probable cause for the requested

warrants and does not set forth all of my knowledge about this matter. All times herein are

approximate.

## PROBABLE CAUSE

### Description of Target Locations

A.      Target Location 1 - 133 Azalea Drive, Harwich, Massachusetts

8.      133 Azalea Drive, Harwich, Massachusetts is described as a single-family, one-

level residence with yellow siding, brown shutters, and a brown front door.  The front of the

house includes a bay window to the right of the front door, and two windows to the left of the

front door.

9.      I believe that BANTON resides at the Target Location 1 for the following

reasons.   First, location information received pursuant to state search warrants for two phones

believed to be used by BANTON have shown those phones in the vicinity of the Target Location

1 since March 9, 2022.  More specifically, location information received for telephone number

774-212-7886 ("BANTON Phone 1") showed this phone located in the vicinity of the Target

Location 1 during the nighttime hours (when BANTON would be sleeping) from March 9, 2022

to May 12, 2022.  Furthermore, location information received for telephone number 401-578-

7903 ("BANTON Phone 2") shows this phone located in the vicinity of the Target Location 1

during the nighttime from May 13, 2022 to May 17, 2022.[1]

10.     Second, surveillance conducted during this investigation has also revealed that BANTON resides at the Target Location 1.  For instance, as described below, during the week of February 28, 2022, agents observed a vehicle pick up BANTON from this residence.  Moreover, a cooperating source of information ("CS-1")[2] identified the Target Location 1 as the residence of BANTON.  CS-1 described the inside of the residence as containing a kitchen and living room on the right-side of the house (viewing the house from the front), with two bedrooms located on the left-side of the house.  Consistent with CS-1's description, according to *zillow.com* (accessed on May 17, 2022), the Target Location 1 is a "912 square foot single family home" with "2 bedrooms and 1.0 bathrooms."

11.     As described below, CS-1 conducted an undercover buy with BANTON at the Target Location 1 during the week of May 9, 2022.  Third, according to a police report from

---

[1] As also described below, a cooperating source of information ("CS-1") identified these phone numbers as belonging to BANTON.  Earlier in the investigation, in February 2022, CS-1 identified BANTON Phone 1 as the phone used to order illegal drugs from BANTON.  Then, during the week of May 2, 2022, CS-1 reported to investigators that BANTON was now using BANTON Phone 2.  CS-1 reported that during that week, CS-1 had called BANTON Phone 1.  There was no answer.  CS-1 said that BANTON called CS-1 back from BANTON Phone 2 and instructed CS-1 to start using BANTON Phone 2 for drug deals.

[2] I have not named CS-1 herein to protect CS-1 from retaliation from BANTON and his associates.  CS-1 has been cooperating with investigators since September 2021. I consider CS-1 to be reliable as information provided by CS-1 has been used in investigations resulting in seizures of illegal drugs and money, and the arrest of at least one individual.  That arrest resulted in charges in Falmouth District Court where the charges remain pending.   CS-1 has been arrested twice for possession of Class A drugs.   One of those charges was dismissed and the other was continued without a finding.  CS-1 is cooperating in exchange for financial compensation.  CS-1 has used cocaine, fentanyl and heroin, and has also sold drugs on behalf of others.  During all interactions with law enforcement in this investigation, CS-1 has showed no signs of being under the influence of either drugs or alcohol.  Information provided by CS-1 has been corroborated to the extent possible.  CS-1 is not willing to testify because of safety concerns.

Harwich Police, on August 24, 2021, police responded to the Target Location 1 related to a

domestic incident between a female (who identified herself as BANTON's girlfriend) and

BANTON.  When police responded, they located BANTON at the Target Location 1.  Fourth,

according to a public records database checked on May 17, 2022, the Target Location 1 is the

residence of BANTON since approximately September 2021 to May 17, 2022.

      B.     <u>Target Location 2 - 18 Autumn Drive, Yarmouth, Massachusetts</u>

      12.     18 Autumn Drive, Yarmouth, Massachusetts is described as a Cape-style single-

family, one-level residence with light-brown, weathered siding, blue shutters and a blue front

door.

      13.     I believe that REID resides at the Target Location 2.  According to REID's

Massachusetts Board of Probation Record, the Target Location 2 is his residence.  In addition, as

described below, REID was arrested at this location on April 26, 2022, and he provided the

Target Location 2 as his address during booking.  In addition, I believe that the Target Location

2 is used by BANTON to distribute and store illegal drugs. As described in detail below, in May

2022, a source of information ("SOI-1")[3] stated that BANTON distributes drugs from this

location.  CS-1 also reported that BANTON uses the Target Location 2 to distribute drugs.  Also,

as described below, surveillance conducted as part of a controlled buy during the week of May 2,

---

[3] I have not named SOI-1 herein to protect SOI-1 from retaliation from BANTON and his associates.  SOI-1 has a criminal history including convictions for being present where a Class A drug is stored, knowingly receiving stolen property, shoplifting and larceny.  SOI-1 has also been arrested for trafficking cocaine and heroin, but those charges were dismissed.  SOI-1 has a history of drug abuse, but during all interactions with law enforcement in this investigation, SOI-1 has shown no signs of being under the influence of either drugs or alcohol.  From time to time, SOI-I will provide information to law enforcement, but at this time, SOI-1 is not providing information for financial compensation or for consideration on any potential criminal charges.  I consider SOI-1 to be reliable and information provided by SOI-1 has been corroborated to the extent possible.

2022 showed BANTON driving a Hyundai Kona from the area of the Target Location 2 around
the same time as the controlled buy.

14.     According to CS-1, the Target Location 2 contains both a living room and
basement in which CS-1 has met with BANTON previously. Moreover, according to *zillow.com*
(accessed on May 17, 2022), the Target Location 2 is a "1037 Square Feet single family home"
with "4 beds, 1 bath."  In addition, as described in detail below, during the week of May 2, 2022,
CS-1 purchased cocaine base from BLADE at the Target Location 2.  Furthermore, as described
below, this location has been the site of several arrests in 2022, and multiple individuals with
criminal histories, including narcotics offenses, have been arrested while at the Target Location
2.

## Controlled Buys and Criminal Activity at Target Locations

A.     Target Location 1 - 133 Azalea Drive, Harwich, Massachusetts

15.     As described below, investigators have conducted five controlled buys of cocaine
base involving Target Location 1 using CS-1.  On each occasion, (a) the transaction actually
occurred at Target Location 1 or (b) BANTON or his criminal associate "BLADE" (as further
described below), came from the Target Location 1 immediately before the buy and then
returned to that location immediately after the buy.

16.     By way of background, this investigation stems from information received from
CS-1.  In February 2022, CS-1 reported to investigators that BANTON distributes cocaine and
fentanyl on Cape Cod.[4]  CS-1 positively identified BANTON by reviewing BANTON's

---

[4] BANTON's criminal record shows that he has been convicted of possession of a firearm and
ammunition without a permit (2021), possession of a Class B substance (2018), possession with intent to
distribute Class D (2018), operating negligently (2018) and possession with intent to distribute Class A
and Class B (2017).  BANTON has also been charged, although not convicted of, carrying a firearm

6

Massachusetts driver's license photograph.   CS-1 reported that BANTON sells cocaine for approximately $100 per gram and that he will reduce the price for larger quantities such as 3.5 grams.  CS-1 said that BANTON sells fentanyl for $100 per gram and like cocaine, he offers a reduced price for higher quantities.  CS-1 said that BANTON distributes cocaine and fentanyl from the Target Location 1, where CS-1 said that BANTON resides, and that BANTON will also distribute drugs in parking lots in various locations along the Cape, including in the Lower- and Mid-Cape.  CS-1 further stated that BANTON uses a drug courier whom CS-1 identified as "Blade" ("BLADE").  CS-1 said BLADE is BANTON's cousin and BLADE has delivered drugs to CS-1 when BANTON was not available to meet.

17.     CS-1 agreed to make controlled purchases of illegal narcotics from BANTON under the supervision and direction of DEA agents and task force officers.  These controlled buys are described below.  For each controlled buy, agents or task force officers searched CS-1 and CS-1's vehicle before and after the controlled buy for illegal contraband or money, with negative results each time.  In addition, unless otherwise noted, for each controlled buy, agents surveilled CS-1 to and from the controlled buy.  CS-1 coordinated these controlled buys through phone calls and text messages with BANTON.  Unless otherwise noted, for each of these calls or texts, agents checked CS-1's phone after the phone call or text message to confirm that CS-1 had in fact communicated with BANTON.  Investigators did not audio or video-record the controlled buys described herein because CS-1 expressed safety concerns should CS-1 be recorded.

---

without a license (2019), possession with intent to distribute Class A (2017), assault and battery with a dangerous weapon (2017), and assault and battery upon a pregnant victim (2016).

First Controlled Buy

18.     During the week of February 28, 2022, at the direction and under the supervision

of DEA, CS-1 purchased cocaine base from BANTON with DEA Officially Advanced Funds

("OAF").  Immediately prior to the meeting, under direction from agents, CS-1 texted and called

BANTON, who was using the BANTON Phone 1 (774-212-7886) to arrange the deal.  CS-1 and

BANTON agreed to meet at a location in Harwich, Massachusetts.  Thereafter, agents

established surveillance at the Target Location 1.  Agents observed BANTON exit the Target

Location 1, get into a black Chevrolet Silverado pickup truck, bearing Massachusetts registration

3CFF31, and registered to Bovell McKrachon, and drive to the location where he was meeting

with CS-1.  Agents maintained surveillance on BANTON for his entire trip from the Target

Location 1 to the meet location.  At the meet location, investigators observed BANTON and CS-

1 briefly meet.  BANTON then departed the area and agents observed him return directly back to

the Target Location 1.  Agents then followed CS-1 to another location, where they met with CS-

1, and CS-1 provided them with a white rock-like substance that I believe based on my training

and experience to be cocaine base.  Field testing showed the substance tested positive for the

presence of cocaine base.  CS-1 said that BANTON had provided CS-1 with the cocaine base in

exchange for the OAF.

Second Controlled Buy

19.     During the week of March 7, 2022, at the direction and under the supervision of

DEA, CS-1 purchased cocaine base from BANTON with DEA OAF.   Again, under the direction

and supervision of agents, CS-1 called the BANTON Phone 1 to set up the deal.  On this

occasion, CS-1 spoke with BANTON's cousin, who CS-1 identified as "Blade" ("BLADE").[5]

CS-1 told investigators that BANTON had told CS-1 that if BANTON was not around, BLADE

would answer the phone and facilitate the narcotics transaction.[6]  BLADE agreed to meet with

CS-1 at a location in Harwich, Massachusetts to sell CS-1 cocaine base.  Thereafter, that same

day, CS-1 traveled to the agreed-upon location.  At the same time, investigators established

surveillance at the Target Location 1.  Investigators saw a black male, later identified by CS-1 as

BLADE exit the residence and then walk on foot a short distance to the meet location.  Agents

then observed BLADE and CS-1 meet briefly.  Thereafter, BLADE departed the area and

returned directly back to the Target Location 1.  This was the last time that agents surveilled

BLADE to and from the Target Location 1.  Agents then followed CS-1 to another location,

where they met with CS-1, and CS-1 provided them with a white rock-like substance that I

believe based on my training and experience to be cocaine base.  Field testing showed that the

substance tested positive for the presence of cocaine base.  CS-1 stated that BLADE had supplied

CS-1 with the cocaine base in exchange for the OAF.

Third Controlled Buy

20.     During the week of March 14, 2022, under the direction and supervision of DEA,

CS-1 purchased cocaine with OAF from BLADE on behalf of BANTON.    On the day of the

transaction, CS-1 called the BANTON Phone 1.  According to CS-1, BLADE answered and

instructed CS-1 to travel to the Target Location 1 for the drug deal.  Agents then conducted

---

[5] CS-1 does not know BLADE's real name and he has yet to be fully identified by investigators.

[6] Investigators obtained travel records showing BANTON had flown to Jamaica on March 9, 2022.

surveillance as CS-1 traveled to the Target Location 1, parked CS-1's vehicle, entered the Target Location 1 and then exited within moments.  Agents then followed CS-1 to another location, where they met with CS-1, and CS-1 provided them with a white rock-like substance that I believe based on my training and experience to be cocaine base.  Field testing showed that the substance tested positive for the presence of cocaine base.  CS-1 said that BLADE had supplied CS-1 with the drugs at the Target Location 1 in exchange for the OAF.

Fourth Controlled Buy

21.      During the week of April 4, 2022, under the direction and supervision of DEA, CS-1 purchased cocaine with OAF from BLADE on behalf of BANTON.    On the day of the transaction, CS-1 called the BANTON Phone 1.  According to CS-1, BLADE answered and instructed CS-1 to travel to the Target Location 1 for the drug deal.  Agents then conducted surveillance as CS-1 traveled to the Target Location 1, parked CS-1's vehicle, entered the Target Location 1 and then exited within moments.  Agents then followed CS-1 to another location, where they met with CS-1, and CS-1 provided them with a white rock-like substance that I believe based on my training and experience to be cocaine base.  Field testing showed that the substance tested positive for the presence of cocaine base.  CS-1 said that BLADE had supplied CS-1 with the drugs at the Target Location 1 in exchange for the OAF.

Fifth Controlled Buy

22.      During the week of May 9, 2022, at the direction and under the supervision of DEA, CS-1 purchased cocaine base from BANTON with OAF.[7]  Immediately prior to the

---

[7] Prior to this buy, during the week of April 4, 2022, CS-1 spoke with BANTON over the BANTON Phone 1.  BANTON reported that he had returned from Jamaica.  CS-1 reported this communication with BANTON to law enforcement immediately after it occurred.

meeting and under direction from agents, CS-1 texted and called BANTON, who was using the

BANTON Phone 2 (401-578-7903) to arrange the deal.  Prior to this call, CS-1 had advised that

BANTON had a second phone that he uses to arrange drug deals.[8]  I know based on my training

and experience that it is common for drug dealers like BANTON to use several phones as part of

their illegal activities.  During the call, BANTON instructed CS-1 to come to the Target Location

1 for the deal.  Thereafter, agents surveilled CS-1 to the Target Location 1.  Agents observed CS-

1 enter the residence and then moments later, exit the Target Location 1.  Agents then followed

CS-1 to another location, where they met with CS-1, and CS-1 provided them with a white rock-

like substance that I believe based on my training and experience to be cocaine base.  CS-1

further explained that CS-1 had just obtained the substance from BANTON in exchange for the

OAF.  Based on my training and experience, I believe this substance contains cocaine base.

Field testing showed the substance test positive for the presence of cocaine base.  In addition,

location information obtained by court order for the BANTON Phone 1 showed this phone in the

vicinity of the Target Location 1 at the time of this controlled buy.[9]

### B.    Target Location 2 - 18 Autumn Drive, Yarmouth, Massachusetts

23.    As described below, agents have conducted a controlled buy involving the Target

Location 2 using CS-1.  In addition, as also described below, this location has recently been the

---

[8] As also described above, during the week of May 2, 2022, CS-1 called the BANTON Phone 1
and there was no answer.  BANTON called back from the BANTON Phone 2 and instructed CS-1 to now
use this phone for drug deals. CS-1 reported this communication with BANTON to law enforcement
immediately after it occurred.

[9] Even though BANTON had instructed CS-1 to utilize BANTON Phone 2 to coordinate this
undercover buy, agents were still receiving court-ordered location information as to BANTON Phone 1,
which explains why agents located the phone in this vicinity at this time.

site of a drug overdose, as well as other criminal activity, and a source of information informed investigators that this location is used by BANTON to distribute illegal drugs.

24.     By way of background, during the month of May 2022, the above-mentioned source of information ("SOI-1") advised agents that BANTON, whom SOI-1 referred to as "Jamaica" sells crack cocaine and fentanyl out of the Target Location 2.  SOI-1 further advised that on one occasion, SOI-1 saw BANTON holding a firearm inside the Target Location 2.  SOI-1 did not report any further specific details about this occurrence where SOI-1 observed the firearm, e.g.,  when it occurred or who else was present.  SOI-1 described the Target Location 2 as a "trap house." I am aware based on my training and experience that the term "trap house" refers to a place where individuals involved in the sale of narcotics store and sell narcotics.

25.     During the week of May 2, 2022, under the direction and supervision of DEA, CS-1 purchased cocaine with OAF from BLADE on behalf of BANTON.    On the day of the transaction, CS-1 called the BANTON Phone 1.  BANTON answered the phone and directed CS-1 to travel to the Target Location 2 for the deal.  Agents established surveillance at the Target Location 2 and observed a Hyundai Kona, bearing Massachusetts registration 4BSL61, and registered to EAN Holdings (the holding company for Enterprise Rental Car) (the "Hyundai Kona") arrive at the Target Location 2.  Rental car records show this vehicle was rented at the time by a female with no known connection this investigation.  Agents observed two black males exit the Hyundai Kona and enter the Target Location 2.  The Hyundai Kona then departed the area.  As the vehicle was leaving the area, agents confirmed that the driver was BANTON,

whose appearance agents knew through his past encounters with Barnstable Police.[10]

26.     Less than five minutes later, CS-1 then arrived at the Target Location 2.  CS-1 arrived at Target Location 2 after first meeting with agents.  Agents surveilled CS-1 as CS-1 traveled from this meet location directly to the Target Location 2.  CS-1 then entered the Target Location 2 and then within a few moments exited the house, returned to CS-1's vehicle and departed the area.  Agents surveilled CS-1 to another location where CS-1 provided agents with a white rock-like substance that I believe, based on my training and experience, to be cocaine base. Field testing showed that the substance tested positive for the presence of cocaine base.  CS-1 said that BLADE had supplied CS-1 with the drugs inside the Target Location 2 in exchange for the OAF.

27.     Police reports from Yarmouth, Massachusetts provide further probable cause to believe that the Target Location 2 is being used to commit the Target Offenses.  For example, on February 14, 2022, Yarmouth Police responded to the Target Location 2 for a reported drug overdose.  When officers arrived on scene, a man was suffering a drug overdose and police administered naloxone, which is a drug used by law enforcement to save the life of someone suffering from an overdose.  The man was transported to the hospital, where he admitted to police that he had in fact ingested drugs.

28.     About two months later, on April 4, 2022, police again responded to the Target Location 2 on a report of a stabbing.  Based on that investigation, Michael Averett (born 1990) was charged with attempted murder for a stabbing that the investigation has shown occurred

---

[10] Two days prior to this deal, agents observed the Hyundai Kona parked in the driveway of the Target Location 1.

inside the Target Location 2.  Those charges remain pending.  Averett's criminal record shows a

conviction for possession of a Class A substance in 2021, possession with intent to distribute

Class A and B substances in 2015, possession with intent to distribute cocaine is 2014, resisting

arrest in 2015, resisting arrest in 2014, inducing a minor to sex in 2009, and assault and battery

in 2008.

       29.    That same month, on April 26, 2022, officers again responded to the Target

Location 2 for a reported domestic disturbance.  As a result of that call, three individuals were

arrested.  Caleb Henderson (born 2004) was arrested for possession of a large capacity firearm

and carrying a firearm without a license; REID was arrested for domestic assault and battery; and

David Kimball (born 1980) was arrested on an outstanding warrant for several charges, including

breaking and entering at night with an intent to commit a felony.  The criminal records of these

individuals show that REID received a CWOF in 2004 for possession of a Class D substance and

was also charged, although not convicted of, possession with intent to distribute a Class D

substance in 2010.  Kimball was convicted of distribution of Class B in 2017, operating under

the influence of drugs in 2017, distribution of heroin in 2016, breaking and entering in the

daytime with intent to commit a felony in 2010, knowingly receiving stolen property in 2010,

knowingly receiving stolen property in 2006 and conspiracy to distribute heroin in 2002.  In

addition, Kimball has been arrested for, although not convicted of, possession of Class B in

2013, distribution of class A in 2010 and possession of Class A in 2009.

       30.    Based on the information provided above, there is probable cause to believe: (a)

that the Target Offenses are being committed by BANTON, BLADE, and others; and (b) that the

Target Location 1, the Target Location 2, and the person of BANTION contain evidence, fruits

and instrumentalities related to the Target Offenses.  Agents have conducted five controlled buys

between February 2022 and May 2022 directly involving the Target Location 1.  This included

occasions where BANTON or BLADE traveled (1) from the Target Location 1 to the drug deal

and then back to the Target Location 1; (2) or the deal actually occurred at the Target Location 1,

including the most recent deal during the week of May 9, 2022.

31.     Meanwhile, CS-1 conducted a drug deal with BLADE at the Target Location 2

during the week of May 2, 2022; SOI-1 told agents in May 2022 that "Jamaica" uses the Target

Location 2 to distribute crack cocaine and fentanyl; and as recently as February 2022, police

responded to this residence for a drug overdose.  This incident in February 2022 is particularly

important because it demonstrates a pattern of long-standing and continued use of the Target

Location 2 for the commission of the Target Offenses.  In addition, on two occasions in April

2022, individuals with lengthy criminal records, including convictions for narcotics offenses,

were arrested at the Target Location 2, providing further probable cause to believe this location

contains evidence related to the Target Offenses.

### Drug Trafficker's Use of Residences and Cellular Telephones

32.     Based on my training and experience, and the collective experience of other

investigators participating in this investigation, I know that traffickers of controlled substances

frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain

their ongoing drug business. I also know that traffickers of controlled substances usually keep, in

addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and

distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils,

at their residences or stash locations. Based upon my training and experience, as well as the

training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

33.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

34.     Likewise, money launderers keep detailed records of their financial transactions to evidence them. Because money launderers provide repeated services to some DTOs, it is necessary for them to maintain these records for extended periods to avoid unnecessary and duplicative exchanges of banking account information. This information is normally stored in the

electronic devices that money launderers use to conduct financial transactions, such as cell phones and computers.

35.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

36.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering are often kept in their residences. Moreover, the cash proceeds of drug trafficking and money laundering often contain traces of the narcotics sold or bought by the drug dealers.

37.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am

aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

38.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.  In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

39.     Finally, as noted above, evidence of drug trafficking and money laundering crimes can be found in the cell phones, smart phones, and computers referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones and computers.

40.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple

cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers

of and the particular numbers dialed by particular cellular telephones can be evidence of drug

trafficking, particularly in a case involving the interception of communications between drug

traffickers. Such numbers can confirm identities of particular speakers and the occurrence of

certain events.

41.     As with most electronic/digital technology items, communications made from an

electronic device, such as a computer or a cell phone, are often saved or stored on the device.

Storing this information can be intentional, for example, by saving an e-mail as a file on a

computer or saving the location of one's favorite websites in "bookmarked" files. Digital

information can also be retained unintentionally. Traces of the path of an electronic

communication or of an internet search may be automatically stored in many places on a

computer or a cell phone. In addition to electronic communications, a user's Internet activities

generally leave traces in the web cache and Internet history files. A forensic examiner often can

recover evidence that shows when and in what manner a user of an electronic device, such as a

computer or a cell phone, used such a device.

42.     Electronic files or remnants of such files can be recovered months or even years

after they have been downloaded, deleted, or viewed via the Internet. Electronic files

downloaded to a hard drive can be stored for years at little or no cost. Even when such files have

been deleted, they often can be recovered months or years later using readily available forensic

tools. When a person "deletes" a file on an electronic storage device such as a computer, the data

contained in the file often does not actually disappear; rather, that data often remains on the

device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files,

may reside in free space or slack space -- that is, in space on a device that is not allocated to an

active file or that is unused after a file has been allocated to a set block of storage space -- for

long periods of time before they are overwritten. In addition, a computer's operating system may

also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been

viewed via the Internet are automatically downloaded into a temporary Internet directory or

"cache." The browser typically maintains a fixed amount of hard drive space devoted to these

files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device

depends less on when the file was sent, downloaded, or viewed than on a particular user's

operating system, storage capacity, and habits.

43.     The Target Locations to be searched may contain computer equipment whose use

in the Target Offenses or storage of the things described in this warrant is impractical to

determine at the scene. Computer equipment and data can be disguised, mislabeled, or used

without the owner's knowledge.  In addition, technical, time, safety, or other constraints can

prevent definitive determination of their ownership at the premises during the execution of this

warrant.  If the things described in Attachment B are of the type that might be found on any of

the computer equipment, this application seeks permission to search and seize it onsite or off-site

in order to determine their true use or contents, regardless of how the contents or ownership

appear or are described by people at the scene of the search.

44.     The law enforcement agents will endeavor to search and seize only the cellular

telephones or computer equipment which, upon reasonable inspection and/or investigation

conducted during the execution of the search, reasonably appear to contain the evidence in

Attachment B because they are associated with (that is used by or belong to) BANTON.

45.     If the search team determines that there is no reason to seize certain computer equipment during the execution of this warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical. Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files. Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment. However, imaging at the premises can often be impractical, because imaging is resource-intensive:  it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and specialized equipment, both of which might be unavailable. If law enforcement personnel do create an image at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off site.

46.     This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

<u>Unlocking a Device Using Biometric Features</u>

47.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

48.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

49.    The passcodes that would unlock the Subject Device/Apple device(s) found during the search of the Target Locations is not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the Subject Device/Apple device(s) found during the search of the Target Locations to the device's fingerprint sensor or to hold the device

22

up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

50.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

51.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of BANTON to the sensor of the devices or place the devices in front of BANTON for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

52.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related and/or money laundering evidence typically have

been recovered in both conventional and electronic formats:

a.  controlled substances;

b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

24

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

53.     Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking. I believe that evidence of their drug trafficking offenses will be found inside each of the Target Locations and on certain cellular telephones and computers belonging to BANTON seized therefrom.

## CONCLUSION

54.     Based on the information set forth above, probable cause exists to believe that  the Target Subjects have engaged in the Target Offenses and that evidence of their criminal offenses, as set forth herein and in Attachment B will be found inside each Target Location and on the person of BANTON.

Sworn to under the pains and penalties of perjury,

*Kyle Phelan* DLC
Kyle Phelan
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 on May 18, 2022.

Donald L. Cabell
United States Magistrate Judge

25

## <u>ATTACHMENT A-1</u>

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

133 Azalea Drive, Harwich, Massachusetts is described as a single-family, one-level residence with yellow siding, brown shutters, and a brown front door.  The front of the house includes a bay window to the right of the front door, and two windows to the left of the front door.  This residence is pictured below:



## ATTACHMENT A-2

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

18 Autumn Drive, Yarmouth, Massachusetts is described as a Cape-style single-family, one-level residence with light-brown, weathered siding, blue shutters and a blue front door. The residence is pictured below:



**ATTACHMENT A-3**

Ryan BANTON a/k/a "Jamaica" (born 1996) as pictured below:



## ATTACHMENT B

## ITEMS TO BE SEIZED

I.   All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of federal narcotics violations under 21 U.S.C. §§ 841(a)(1) and 846, including:

   a.   Illegal narcotics; any substance containing any detectable amount of narcotics.
   b.   Any material used to cut, dilute, or otherwise adulterate narcotics.
   c.   Items and objects utilized in the packaging or distribution of narcotics, including bags, scales, and sealing devices or materials;
   d.   Any and all cash, currency, and records (whether in documentary or electronic format) relating to the receipt, transfer, storage, or use of proceeds from narcotics distribution or the expenses relating to narcotics acquisition or distribution, including ledgers, books, notes, and money orders;
   e.   Any and all communications (whether in documentary or electronic format) sent or received since February 2022 that relate to the acquisition, storage, transportation, or distribution of any controlled substance, or that relate to the receipt, transfer, storage, or use of proceeds from narcotics distribution or the expenses relating to narcotics acquisition or distribution, and any and all records relating to or referencing such communications;
   f.   Any and all records (whether in documentary or electronic format), books, logs, receipts, notes, ledgers, or data relating to the acquisition, storage, transportation, or distribution of any narcotics that were created, sent, received, consulted, or modified since February 2022.

II.  Records and tangible objects relating to the occupancy, control, or use of the residences located at 133 Azalea Drive, Harwich, Massachusetts and 18 Autumn Drive, Yarmouth, Massachusetts, including but not limited to, photographs, bills, statements, receipts, and keys.

III. Any cellular telephone(s) or computers that are found in the possession or under the control of Ryan BANTON a/k/a "Jamaica" (born 1996), found among his personal items or that agents establish during the execution of the search warrants are used by BANTON, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of these cellular telephone(s) or computers, including but not limited to:

29

     a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

     b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

     c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

     d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

     e. GPS data;

     f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

     g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

     h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

     i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

IV.    During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb and/or fingers of BANTON onto the fingerprint sensor of cellular telephones belonging to BANTON (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the cellular telephone in front of the face of BANTON with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized cellular telephones requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized cellular telephones, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or

instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If cellular telephones cannot be returned, agents will make available to the cellular telephones' owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all cellular telephones seized pursuant to this warrant for as long as is necessary for authentication purposes.